RELIANCE, The (DOWLING v.). See Case No. 4,042.

RELIANCE, The (ROGERS v.). See Case No. 12,019.

## Case No. 11,693.

### The RELIEF.

[Olc. 104.] [1]

District Court, S. D. New York. April, 1845.

COLLISION—NEGLIGENCE—FERRY BOATS—NAVIGATION OF EAST RIVER.

1. In an action for a collision between two steam vessels, the prosecuting vessel must prove she used all proper precautions and measures to prevent it.

2. She cannot sustain the action merely by convicting the other steamer of negligence or fault in her movements, which conduced to the collision.

3. A steamer coming upon, or crossing the track of ferry boats, plying upon the East river, between New-York and Brooklyn, is bound to special watchfulness not to interfere with their course, or impede their passages.

[Cited in The Pequot, 30 Fed. 841; The Breakwater, 15 Sup. Ct. 101.]

4. Long experience has demonstrated the importance to the protection of vessels navigating up and down the East river to hold to the centre of it, as nearly as may be, and it is culpable conduct to move a steam-tug from place to place, by running her along near the ends of the piers.

[Cited in The Monticello, 15 Fed. 476; The Amos C. Barstow, 50 Fed. 623; The Breakwater, 15 Sup. Ct. 101.]

5. The master of the tug is bound to put her out into the stream, so as to disclose clearly her position and direction.

This was a cause of collision between two steamboats. The libel charges that the tug-boat Jacob Bell, on the 26th of April, 1844,

1 [Reported by Edward R. Olcott, Esq.]

left her moorings at pier No. 20, East river, between 8 and 9 a. m., to proceed to pier No. 23, East river, alongside the ship Cambridge, a distance of about six hundred feet; that she had passed the ferry slip at Fulton-street, and had lapped twenty-five feet on the ship Cambridge; that the steamer Relief, plying as a ferry boat between Brooklyn and New-York, was coming rapidly across the river from Brooklyn; the Jacob Bell being out of her track, the Relief, through negligence and carelessness, was run against the Jacob Bell, inflicting serious injuries to her damage of more than $300.

The answer interposed by the president of the New-York and Brooklyn Union Ferry Company alleges, that the Relief was at the time proceeding on the usual and proper course across the river, to the New-York side, in her employ as a ferry boat, the tide being ebb; that the Relief being about 300 yards from the ferry slip where she was to land, and the tug at the time moving up, a considerable distance west of the west pier of that slip, instead of steering out into the river, and passing astern of the Relief, or stopping below or at the pier, so as to allow the Relief to pass on into the ferry slip, as she ought to have done, ran directly ahead, attempting to pass between the bow of the Relief and the east pier of the slip; that the wheels of the Relief were thereupon immediately reversed, and every effort made to avoid coming into collision with the Jacob Bell; but that the Bell, continuing her course directly ahead, and the ebb tide drifting the Relief down the river, the Bell came in collision with her, (still backing water,) when the bows of the Bell were opposite to the east pier of the said ferry slip; that the collision might have been avoided by timely or proper exertion on board the Bell, and was wholly occasioned by negligence, ignorance or misconduct in navigating her; that the Relief was a staunch, heavily-timbered boat, and was injured by the collision, costing $45 to repair her, besides loss of time, &c.

Philip Hamilton, for libellants.
Mr. Rockwell, for claimants.

BETTS, District Judge. The argument in this cause has been mainly limited to a critical examination of the clashing opinions of witnesses, and the variant version of the facts stated by them. Upon a careful consideration of the voluminous and contradictory evidence produced by the parties, I find the preponderance of proofs establishes these particulars. That the Relief was on her route from one ferry slip to the opposite one, and one-third or one-half the distance across the river when the Jacob Bell was put in motion, from her berth, at pier No. 20, on the New-York side of the river; the tide was ebb. The Bell put off from her berth into the river sufficiently to clear the

docks, and then run directly up towards pier No. 23, with a light steam and slow motion. By the ordinances governing the New-York ferries and ferry slips, it is declared the duty of all vessels to avoid incommoding or obstructing the ferry boats making their passages, and such is the known usage in navigating vessels on or across the line of the ferry. The pilot of the Jacob Bell, on this occasion, did not observe the Relief until the boats were so near each other as to threaten an immediate collision, and then called out to the Relief to back her engine and keep out of the way. In point of fact, the engine of the Relief had been reversed and was working back before such call was made; the estimate of the distance of the two boats apart at that time rests only on hasty conjecture, and cannot be relied upon as determining it as one hundred or three hundred yards; but the effect of the back action of the engine of the Relief affords reason to suppose that if a like direction had been given the engine of the Bell at the same time, the collision, if not avoided, would have been so light as to occasion little or no damage. When the engine of the Relief was reversed, the Bell had not passed the west pier of the ferry slip No. 21, and without checking her engine, continued directly ahead. When the boats struck, the Relief had no headway from her engine, and was carried downwards by the drift of the tide. The place of collision was opposite the east pier of the ferry slip, which is pier No. 22, the next pier westward from the ship Cambridge, which lay at pier No. 23. All reasonable and practicable efforts were made on the Relief to avoid the collision when it was discovered that the tug was going under her bows, and would cut her off the entrance to her slip, between piers 21 and 22. This summary of the facts shows that proper precaution was not used on board the Bell in navigating her on the occasion, and that the collision occurred by means of her fault or inattention. This conclusion of fact is sufficient reason for the rejection of the libellants' action, as upon the undisputed doctrines of the laws of navigation, the prosecuting vessel must prove herself clear of fault, and also establish culpable neglect or actual misfeasance against the other, in order to maintain a suit for injuries by collision. So, also, if there were fault or want of care on both sides, or no fault on either side, the action must fail. 3 Kent, Comm. 293. Judge Story remarks, that in all cases of collision the essential question is, whether proper measures of precaution are taken by the vessel which has unfortunately run down the other. Story, Bailm. §§ 6, 11.

These elementary principles of the law bar the right of action in this case, and it would not be requisite to motive the decision with any particularity, except to give prominency to a feature in this case, which is of higher general importance than the special merits of this action or defence. The case brings to view the rights of ferry boats to an undisturbed passage between their landing places, in the performance of their duties in that capacity, as a species of privilege or immunity not accorded to other vessels. It is strenuously denied, on the part of the libellants, that ferry boats have any privileges of navigation not common to all other vessels. The facts in this case do not present that specific point for adjudication, but it calls upon the court to notice that the steam-tug was put off from her berth and pursuing her business on this occasion, directly adjacent to the line or track run by the ferry boats, and that their transits at that ferry are, with but a very few minutes interval of time, in constant continuance during the day. Whilst the rapidity of the currents in the East river, the numerous craft of all classes passing its waters, and the safety and lives of great numbers of persons conveyed in the ferry boats on every trip, exact the utmost vigilance and circumspection in the navigation, the same considerations require, in reason and law, that other vessels approaching the track of these boats, under such notorious warning of the probability of their being also upon or near it, should be conducted with extreme watchfulness and precaution, so as not to impede the regular running of ferry boats, or endanger the passengers conveyed in them; and the city government, which possesses full power over the subject by its ordinances, interdicts all obstructions to the free course of ferry boats. Long experience has demonstrated the importance to the protection of vessels navigating the East river in that vicinity, to require steam vessels to keep as near as possible to the centre of the stream in passing up and down it, and the general usage conforms, in a great degree, to that necessity. A special law may still be demanded to give full effect to this requirement. The custom and usage, although serviceable in keeping moving vessels away from shipping moored along the piers and near the shore, and also in unmasking them from the cover of the docks and vessels in or adjacent to the slips, has yet a more beneficial application to the navigation of ferry boats from the New-York and Brooklyn shores, on the numerous ferries between those cities, it being indispensable that the exit from and entrance into the ferry slips should not be checked or embarrassed by the presence of other vessels passing close to them. In this instance, had the master of the tug exercised the watchfulness his position and action demanded, he could not have failed to discover his exposure to collision with the approaching ferry boat, and might easily have used the means of avoiding it; or. if, instead of hugging the wharves in his evolution, he had gone out openly into the stream, he would have afforded the ferry boat opportunity to escape. or lessen the danger of a meeting on her track.

I think the evidence shows the collision was occasioned by the culpable inattention of those managing the Jacob Bell, and that accordingly the libel must be dismissed, with costs.