## THE STEINWAY.

### CITY OF NEW YORK v. NEW YORK & E. R. FERRY CO.

(Circuit Court of Appeals, Second Circuit. January 6, 1905.)

COLLISION—STEAMBOAT AND FERRYBOAT CROSSING—STEAMER TOO CLOSE INSHORE.

A steamboat proceeding through Hell Gate toward New York *held* solely in fault for a collision with a ferryboat which had just left her slip at Astoria, on the ground that she was proceeding too close inshore as she rounded Hallett's Point, and also for not keeping her course under the starboard-hand rule, although the ferryboat gave the proper signal, and her course indicated that she intended to pass under the steamer's stern, as required by the rule.

Appeal from the District Court of the United States for the Southern District of New York.

Appeal from a final decree of the District Court for the Southern District of New York dismissing the libel of the city of New York, brought to recover damages for injuries received by the libelant's steamer Fidelity in a collision with the respondent's ferryboat Steinway, near

her slip at Astoria, East River. The testimony was all taken in the presence of the judge. The opinion below is reported in 130 Fed. 397.

E. Crosby Kindleberger, for appellant.

La Roy S. Gove, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. The collision occurred near the Astoria Ferry slip at half past 12 on the afternoon of October 22, 1902. The day was clear, the tide ebb, the wind fresh from the southwest. The Fidelity, bound down the river through the western channel between New York and Blackwell's Island, rounded Hallett's Point only 50 feet from the shore, proceeding at the rate of about 10 miles an hour. At this time the Steinway was emerging from her slip intending to make a trip to New York. Her speed was about 8 miles an hour. The rules applicable to this situation are as follows:

"Art. 19. When two steam-vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side (The Steinway) shall keep out of the way of the other." (The Fidelity.)

"Art. 21. Where by any of these rules one of two vessels is to keep out of the way, the other (The Fidelity) shall keep her course and speed.

"Art. 22. Every vessel (The Steinway) which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Act June 7, 1897, c. 4, 30 Stat. 96, 101 [U. S. Comp. St. 1901, pp. 2875, 2883].

The inspectors' rule No. 2 provides that the steam vessel having the other on her starboard side shall indicate by one blast of her whistle her intention to direct her course to starboard and two blasts if directing her course to port, to which the other shall promptly respond.

It was the manifest duty of the Steinway to avoid crossing ahead of the Fidelity and to keep out of her way. It was equally the duty of the Fidelity to maintain her course and speed. This she did not do. The district judge has so found and, as he had the advantage of seeing and hearing the witnesses, his conclusions upon disputed facts should not be disturbed. That the Fidelity changed her course in direct violation of the rule seems manifest. From Hallett's Point her course was laid for a point 200 feet west of Blackwell's Island. The collision occurred opposite the marble yard from 100 to 200 feet from the Astoria shore, a point which it would have been impossible for the Fidelity to reach had she held her course. Instead of being 150 feet from the shore she would have been well out in the river. Her initial fault was rounding Hallett's Point within 50 feet of the shore. She knew that she was entering Hell Gate, the most dangerous bit of water surrounding New York Harbor; she knew that a few hundred feet below there was a ferry slip where it was quite likely a ferryboat was going out or coming in; she knew that these boats require, and are allowed, ample space in which to maneuver in the vicinity of their slips (The Breakwater, 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139) and yet she shaved the shore so closely that it was not possible to get an accurate view of the situation on her port hand until she had actually rounded the point. Had she come down in the center of the river she could have

obtained a wider view of the situation and, if danger threatened, would have had ample space in which to avoid it.

Her master testifies that he thought the first whistle from the Steinway was intended for the tug C. R. Stone and not for the Fidelity. The Stone was proceeding down the river with a tow on a hawser about 30 fathoms in length and was a little below the ferry slip, in a position where a one blast signal would seem to be supererogatory, but as the Stone also assumed that it was intended for her the mistake of the master of the Fidelity was excusable. There can be no doubt, however, that the signal conveyed to him the intelligence that the Steinway's wheel was aport and that she was swinging to starboard. Indeed, he so states explicitly—

"As she came out she blowed one whistle, then commenced to turn up-stream, towards us under a port wheel, turning to starboard, her head turning to starboard. After she blew to the Stone, she was coming around—swinging around—then she blowed another whistle."

In such circumstances the duty of the master was plain; he should have kept his course and, if necessary, should have put his own wheel to port. Had he done this a collision would have been well-nigh impossible. The rule, the signal and the evidence of his own eyes alike admonished him to keep on the outside of the Steinway, but instead of doing so he attempted to crowd in between her and the Astoria shore.

It is argued that the Steinway should have kept on towards her New York landing and that her failure to do so was negligence. It may be that when the vessels first sighted each other the Steinway was farther out from the Astoria shore than the Fidelity, but it must be remembered that the latter's course was not parallel to the shore but was diagonal across the river and we agree with the district judge in thinking that at no time did the Steinway cross the Fidelity's original course. This being so her continuing on across the river, though it might have prevented the collision, would have been in direct violation of the rule requiring her to keep out of the Fidelity's way and also the rule requiring her not to cross ahead. The Steinway was navigating pursuant to her invariable custom with the tide as it was at the time in question, her signals were proper, her helm hard aport and, when the impact came, she had almost come to a standstill. We are unable to designate any act of hers which contributed to the disaster.

The decree of the district court is affirmed with interest and costs.