## THE MAINE.

### THE MANHATTAN.

(District Court, S. D. New York. May 3, 1907.)

COLLISION—STEAM VESSELS MEETING—MUTUAL FAULT.

A collision in the East river, near the Brooklyn Bridge, between a barge in tow on the starboard side of the steamer Manhattan, bound up the river to Pier 24 on the Manhattan side, and the steamer Maine, bound from New Bedford to her pier in the North river, *held* due to the fault of both steamers. The Manhattan *held* in fault for attempting to pass on the starboard side of the Maine from a head and head position without an agreement, and for stopping and reversing after starboarding her helm on failing to receive an answer to her signal, which threw her directly across the Maine's course, and the Maine for not answering signals promptly and for excessive speed, but not for being somewhat on the Brooklyn side of the channel as she was required by the presence of other vessels to depart from the East river rule of the state to keep in the middle, and as the narrow channel rule does not apply to those waters.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 40.

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

In Admiralty. Suit for collision.

Kneeland & Harrison, for libellant.
Wing, Putnam & Burlingham, for the Maine.
Carpenter, Park & Symmers, for the Manhattan.

ADAMS, District Judge. This action arose out of a collision which occurred slightly above the Brooklyn Bridge in the East River on the 1st day of September, 1905, a few minutes after 8 o'clock in the morning, between the barge Abram Collerd, being towed on the starboard side of the steamer Manhattan, and the steamer Maine, which struck the Collerd on the starboard side about amidships, causing her to capsize and lose her deck load of pig lead and vitriol, valued at over $10,-000. The libellant was the owner of the cargo and brought the action against both steamers to recover the said value. The collision was about one-third of the way from Brooklyn to Manhattan. The weather was clear and the tide flood, of three or four knots in strength.

The Collerd was taken in tow at Perth Amboy early in the morning by the Manhattan on a hawser which she continued to use until in the vicinity of pier 24 when the hawser was taken in and the barge placed alongside, projecting about 20 feet ahead of the Manhattan, which was about 95 feet long, somewhat shorter than the barge. They were bound for the Joy Line pier, No. 24 on the Manhattan side of the river.

The propeller Maine, 302.7 feet long and 44 feet beam, was bound from New Bedford to her pier in the North River, with freight and passengers. One of the latter was a Mr. Cushman, a member of the admiralty bar of this court, who has given some valuable testimony in this complicated case with respect to the movements of the Maine. As the vessels approached each other they were about the same distance from the Brooklyn shore and in situations to pass port to port upon porting their helms slightly. About two days before the Maine had broken off one of her propeller blades and she was navigating with three blades which somewhat impaired her speed in going ahead and in reversing and gave her a rough and unsteady motion.

At and near the place of collision the river was very congested, there being numerous vessels proceeding up the river and there was a schooner, anchored under the bridge near the Brooklyn shore. There was also a schooner going to the eastward under full sail.

The libellant claims that both vessels were in fault:

### The Manhattan.

1. For blowing a signal of two whistles and attempting to cross the course of the Maine.

### The Maine.

. For not promptly answering the Manhattan's signal of two whistles.

2. For proceeding down the river on the Brooklyn side.

3. For proceeding at an excessive rate of speed under the existing conditions and in not checking her speed and reversing sooner than she did.

The Manhattan charges the Maine with fault, as follows:

1. In proceeding upon the southerly side of the middle of the river in violation of the laws of the State of New York.

2. In failing to answer the Manhattan's signal of two whistles promptly and in failing to give any signals to the Manhattan until a collision was imminent.

3. In failing to proceed at a moderate rate of speed having due regard to the presence of many vessels in that neighborhood and failing to stop and reverse in time to avoid collision.

4. That the Manhattan was proceeding in accordance with the usual custom for tows upon the flood tide in making a landing upon the Manhattan shore and the Maine was proceeding in violation of the statute both with respect to locality and speed.

The Maine charges the Manhattan with fault, as follows:

1. In not keeping a good lookout.

2. In giving a signal of two whistles when she was nearly head and head with the Maine and in attempting to cross the bow of the Maine instead of stopping until the carfloats and the schooner had passed.

3. In stopping and reversing after she had given a signal of two blasts and thus bringing her tow into collision with the Maine.

4. In not giving a signal of one whistle and porting her helm and passing the Maine port to port.

### The Manhattan.

When the vessels were about a fourth of a mile apart and each the same distance from the Brooklyn shore, say 500 feet, the Manhattan blew a signal of two whistles to the Maine, which the Manhattan claims was not answered by the Maine and therefore the Manhattan stopped and reversed her engines, which had the effect of stopping her in the water and of throwing her head to the port. The Manhattan claims that being bound to the Manhattan shore she was justified in following the Brooklyn shore in order to have ample room for the purpose of manœuvring for her destination on the other side which brought her into the position she first occupied with respect to the Maine, that is practically head and head. There can be no doubt that if she had continued on the contemplated course to Manhattan, she would have passed safely to the starboard of the Maine. The question of a reply from the Maine to the Manhattan's signal of two blasts therefore becomes of some consequence in the case because there can be no doubt that it was by reason of the absence or supposed absence of the reply, that the Manhattan stopped broadside ahead of the Maine. It will be noticed that the Maine's charges of fault are based mainly upon the actions of the Manhattan in attempting a two whistle course when a one whistle course was the proper one under the rules. Whether or not there was a timely reply from the Maine to the proposed course of the Manhattan will be hereafter discussed when the Maine's alleged faults are considered. In any event, it was the manifest duty of the Manhattan in proposing a deviation from the rule to pass the Maine to the right, to obtain her consent before acting, instead of which the Manhattan put her wheel to starboard when or before she first blew to the

Maine and kept it so. Her bow was thus thrown to port and while heading nearly across the river, she stopped and reversed. She was thus thrown directly in the Maine's path and the collision occurred as stated above. The Manhattan was obviously in fault in this respect.

### The Maine.

1. The Manhattan blew the first signal of two whistles when the vessels were about 1500 feet apart. The Maine claims that she answered promptly, but while it is difficult, in the midst of so many conflicting estimates, including those from outside vessels, to determine with any degree of accuracy when the reply was given, I have no doubt that some little time elapsed, enough to cause the Manhattan to be uncertain with respect to any consent to her proposed manœuvre and to cause her reversal. In this particular the Maine was in fault.

2. The Maine was not in fault for her position in the river. She was necessarily somewhat on the Brooklyn side on account of several vessels passing her starboard to starboard and therefore could not be in the middle of the river under the state law. It is also urged against her that she should have been on the Manhattan side of the river under the Narrow Channel Rule but it has been held that such rule does not apply to the East River. The question was presented to this court some time since and so decided in The Hartford (D. C.) 125 Fed. 559, where it was said (560):

"The rule requiring vessels to keep in the middle of the East River established by state statute has not been changed by the pilot rules enacted by Congress June 7, 1897, c. 4, 30 St. 96 [U. S. Comp. St. 1901, p. 2876], the object of the local rule being to keep vessels away from the vicinity of the piers, in order that vessels properly using the wharves shall not be imperiled by vessels going up or down the river. The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139. And the United States statutory regulations for the prevention of collisions, especially provide (article 30) that:

'Nothing in these rules shall interfere with the operation of a special rule duly made by local authority, relative to the navigation of any harbor, river, or inland waters.' Act Aug. 19, 1890, c. 802, 26 Stat. 328 [U. S. Comp. St. 1901, p. 2871]."

This was affirmed upon the opinion of this court. 135 Fed. 1021, 68 C. C. A. 230.

3. The speed of the Maine was apparently excessive. It is not claimed that she was proceeding over the ground at a rate of less than 8 miles as she approached a point where it became necessary to take precautions on account of the presence of other vessels. It appears that prior to the collision she stopped and reversed her engine but did not succeed in stopping her headway even with the aid of the tide and cut almost through the barge at her deck and to her keel below. This was no doubt partly accounted for by the movement of the barge with the tide but such fact does not seem to explain the damage done and I think the testimony of several witnesses that the Maine was going ahead, at variously estimated rates of speed, when the blow came must be credited. The engineer of the Maine, who was handling the engine, said that the bell rang for Hunts Point at 7.08 o'clock, and the steamer was then going hooked up with the throttle about two-thirds open. He

further said that he did not know of the collision until an oiler advised him of it and prior to that, at 8.08 o'clock, he received a bell to slow down; in about 15 seconds he received another bell to stop; that in two minutes received two bells to back and a jingle and he threw the engine wide open; that then he received another jingle and he put the pass over on. This pass over let the live steam into the engine and caused the low pressure to do more work. It was necessary because of the defective condition of the propeller, which a couple of days before had lost one of its blades and was not as efficient as when in perfect condition. The loss of the blade greatly increased the vibration but does not seem to have affected the working of the boat apart from reducing her speed a knot or two but the resort to the pass over was considered by the engineer necessary in view of the propeller's condition. From Hunts Point to the place of collision is approximately 10 miles. Having covered this distance in an hour, notwithstanding the adverse tide, which of course was more of a deterrent in Hell Gate and that vicinity, where the current ran at a greater speed, her speed at or just before reaching the place of collision must have been considerably in excess of the statutory rate of eight miles an hour allowed in this vicinity. It is also evident that the Maine did not stop and reverse in time and should be found in fault in such respects.

The foregoing requires the entry of a decree for the libellant against both vessels, with an order of reference.