## THE BAY STATE.

## THE WRESTLER.

(District Court, S. D. New York. May 21, 1907.)

**1. COLLISION—RULE GOVERNING NAVIGATION OF EAST RIVER.**

The narrow channel rule of article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) requiring steam vessels to keep to the starboard side of the fairway, does not apply to that part of East river between the Battery and Blackwell's Island, which is governed by the local rule requiring vessels to keep in the center of the channel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 8.]

**2. SAME—STEAMER AND MEETING TOW—VIOLATION OF EAST RIVER RULE.**

A collision in the East river south of Blackwell's Island between a steamer bound down the river and a carfloat in tow of a tug bound to dock 4 of the Long Island Railroad slips, *held* due solely to the fault of the steamer in attempting to cross the river to the Brooklyn side from the channel between Blackwells Island and Manhattan, without having obtained the consent of the tug, which was maneuvering to enter her slip, and in violation of the local East river rule, which required her to keep in the middle of the channel.

In Admiralty. Suits for collision.

Wheeler, Cortis & Haight and John W. Griffin, for the Wrestler.

Carver & Blodgett, for the Bay State.

ADAMS, District Judge. The River & Harbor Transportation Company, owner of the carfloat No. 6, brought an action to recover from the steamer Bay State the damages, estimated at $10,000, received on the port side from the latter in a collision between those vessels on the 6th of December, 1906, about 11:45 o'clock P. M. in the East River to the southward of Blackwells Island. The float was in tow on the port side of the tug Wrestler, also belonging to the same libellant. The tide was the last of the flood. The Boutell Steel Barge Company, the owner of the Bay State, brought a cross action to recover the steamer's damages in the collision, said to have approximated $3,500.

The Wrestler took the No. 6 in tow at Greenville, New Jersey, and was bound to the slips of the Long Island Railroad at Long Island City, where she was to be landed at dock No. 4. The sterns of the tug and of the float were about abreast. The tug had a right handed screw and was about 115 feet long. The carfloat was about 230 feet long and was loaded with 14 cars. The tug had a double pilot house, which was of a sufficient height to give those inside a good view over the cars, as well as all around. The tow proceeded on a regular course, which brought it to the eastward of the buoy opposite 10th Street, Manhattan. It then continued towards its destination, but before reaching it the float was struck by the Bay State on the port side about 75 feet from the stern, after the stem of the latter, owing to its overhang, had struck some of the cars and injured them. The Wrestler claims in the libel that when she was proceeding up the river, the Bay State came down in the channel west of Blackwells Island;

that when the Wrestler was off 37th Street, Manhattan, she ported and rounded with her tow towards the Long Island Railroad Slips; that shortly thereafter as the Bay State approached the buoy off 40th Street, Manhattan, the Bay State starboarded, opened up both of her side lights to the Wrestler and headed across towards the Long Island shore; that the latter immediately blew a signal of one whistle to the Bay State but received no answer; that thereupon the Wrestler, still keeping her engines ahead, blew alarm whistles; that the Bay State answered with one long whistle to which the Wrestler replied with one whistle; that nevertheless the Bay State continued to head for the Long Island shore and struck the carfloat on the port side about 85 feet forward of the stern, breaking the float, the cars thereon and injuring their contents.

The Wrestler's owner alleges as faults against the Bay State: (1) in that she starboarded and ran too far towards the Long Island shore and followed the Wrestler across, (2) in that she navigated on the wrong side of the channel, (3) in that she maintained excessive speed and did not stop and reverse or do so soon enough, (4) in that she failed to comply with the Wrestler's first whistle and (5) in that after herself blowing one whistle she failed to direct her course to starboard.

The Bay State was a whale back vessel, 265 feet long and 37 feet wide, with a right hand propeller. She was navigated from a bridge on the hurricane deck over the pilot house about 200 feet from the stem. She had a lookout stationed in the forward turret, which was 25 or 30 feet from the stem. The master and the mate were on the bridge. The steering apparatus was below the bridge and on this occasion it was being operated by the second officer, who received his orders by voice from the bridge through a wooden chute. An indicator on the bridge showed the movements of the wheel. The engine was located aft and signals were given for its operation by means of a small steam whistle, but loud for its size, located near the engine. The steamer alleges that she was proceeding from Boston to Norfolk, Virginia, and came through Long Island Sound on account of tempestuous weather outside; that on December 6th, 1907, she anchored near Riker's Island and having left there about 11 P. M. proceeded to go through the East River, having Blackwells Island on her port side; that at about 11:32 P. M. when about to overtake and pass a tug and tow in the channel between the Island and Manhattan, she slowed down for that purpose and passed it on her own starboard side; that when approaching Man of War Rock, several tows were seen coming up the river bearing about ahead and the speed of the Bay State was again checked until her engines were going dead slow; that about the same time the green side lights of the approaching tows being visible to those on the steamer, she starboarded a little to give them plenty of room to pass starboard to starboard; that the first two tugs and tows passed in safety in conformity with proper signals; that when passing the second tug and tow two whistles were blown by the steamer to the third tow, which proved to be the Wrestler, and were answered by her; that the vessels were then approaching each other green to green and if the Wrestler had held her course, she would have passed in safety; that shortly after the two whistles were

given by the Bay State and answered by the Wrestler, those in charge of the Bay State saw the green light of the Wrestler shut in and the red light appear, showing that the Wrestler was crossing the bow of the Bay State and heading toward the Brooklyn shore; that immediately the engines of the Bay State were put full speed astern in order, if possible, to avoid a collision; that after the engines of the Bay State had been reversed, one whistle was given by the Wrestler, almost immediately followed by two whistles, to which no answers were given by the Bay State; that the Wrestler kept on directly across the course of the Bay State at apparently full speed, without any change whatsoever and the engines of the Bay State were kept at full speed astern until the carfloat came under the bow of the Bay State and the collision occurred; at that time the Bay State was practically still in the water; that after the collision danger signals were given by the Wrestler and several other vessels came up to offer assistance.

The owner of the Bay State charges the Wrestler with fault, as follows: (1) in that she was navigating on the wrong side of the channel, (2) in that she changed her course and attempted to cross the bow of the Bay State, (3) in that she did not stop and reverse or attempt to do so, (4) in that she did not keep out of the way of the Bay State, (5) in that after answering by two whistles the two whistles blown by the Bay State, the Wrestler changed her course to starboard, (6) in that she did not have a competent lookout, pilot, master or crew and (7) in that she took no reasonable and proper measures to avoid the collision.

The place of collision is not very much in dispute. All claim that it was somewhat to the eastward of mid channel. The river at that point is about 2,700 feet wide between the ends of the piers and the place of contact was doubtless about 1,000 feet from the ends of the Brooklyn piers and about opposite the Long Island Railroad ferry slips. The Bay State's theory was that the Wrestler was proceeding on a course to go through the Blackwells Island channel, as the other tows had done, and suddenly changed it across the Bay State's course, her own navigation being based upon a contention that it was usual for westward bound vessels to cross over and follow the Brooklyn side of the river, which accounted for her own position. It was not a fact, however, that the Wrestler ever intended to go to the westward of the Bay State. It is plausibly argued by the Wrestler that she could not have passed the Bay State starboard to starboard and made her slip without going around Blackwells Island and the contention seems to be probable, but I do not depend upon it, but upon what took place between the vessels and the general situation. The Bay State contends that the Wrestler, when she was first observed answered a signal of two whistles from the Bay State, while the Wrestler's testimony is to the contrary effect. Her witnesses said that the Bay State was seen in the West Channel, when her range lights and port side light could be seen, and these lights continued to be seen until after the Bay State was off the Man of War Rock when suddenly both of her side lights became visible. This situation is confirmed by the testimony of the Bay State that after passing the buoy off between 40th and 41st Streets, Manhattan, she gradually turned to her port with a view of passing down the

Brooklyn side. The situation makes any such agreement as contended for by the Bay State highly improbable and as the Wrestler's witnesses are unanimous in contradicting it, it must be rejected. The Bay State's contention that when she was coming through the Blackwells Island channel she saw the Wrestler on her starboard hand is not reconcilable with the topography of the vicinty. A course along Blackwells Island, which the Bay State witnesses say she followed, if continued would place the Wrestler going through a pier in the vicinity of 27th Street, far to the westward of any probable course she would have taken and making it impossible for the witnesses to see the green light of the Wrestler a point or more on the Bay State's starboard bow, as contended for, until the vessels were very much nearer than is anywhere suggested in the testimony or could be inferred from it. It is obvious that when the Wrestler's lights were seen on the starboard bow of the Bay State, it was after the latter had swung to the port. She was then, not before, in a position to see lights below in the river on her starboard bow. I think the Wrestler's contention that until the time of the Bay State's change to port, the vessels were in positions to pass port to port should be sustained and that the Bay State was in fault in this respect.

There has been a great deal of discussion in the briefs upon the effect of the Narrow Channel Rule (Act June 7, 1897, c. 4, art. 25, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), requiring the vessels to keep to the starboard side of the river. This rule, however, does not apply to the East River in this locality, which is governed by the local rule, requiring vessels navigating between the Battery and Blackwells Island to keep in the centre of the river. This Act has recently been referred to by the circuit court of appeals in the case of Wilson v. The Steamtug W. N. Bavier and the Steamship H. M. Whitney (decided April 13, 1907) 153 Fed. 970, as being still in force. The court there said:

"A majority of the court are also of the opinion that the Whitney was not in fault. She was coming up the river well over towards the Brooklyn side, presumably on account of the ebb tide. But if she were in fault for not navigating nearer the center of the river, under the East River statute (section 757, c. 410, p. 211, of the New York City consolidation act of 1882) such fault in no way contributed to the accident. * * *"

Apart from the statute, however, any part of the river, where ferries are running, is within the reason of the rule. It was applied before the passage of the Act (The Favorita, 18 Wall. 598, 21 L. Ed. 856 [1873]; The Relief, 20 Fed. Cas. 525, No. 11,693 [1845]) and has been recently (The Hartford [D. C.] 125 Fed. 559 [1903], affirmed 135 Fed. 1021, 68 C. C. A. 668; Amer. Smelting & Refining Co. v. Steamers Maine and Manhattan [May 3, 1907] 153 Fed. 635). The same principle with respect to ferry slips has also been authoritatively sustained beyond the confines of the statutory limits in the river. The Steinway, 135 Fed. 344, 68 C. C. A. 14. Also in the North River. The Breakwater, 155 U. S. 252, 261, 15 Sup. Ct. 99, 39 L. Ed. 139. The part of the river where this collision occurred is within the rule requiring vessels going up or down the river to keep in the centre, if pos-

sible. It was applicable to the Bay State and authorized the Wrestler to manoeuvre for and approach her slip.

The original cause of trouble seems to have been the consent of the Bay State to the proposed course of a tow in the channel between Blackwells Island and Manhattan to pass to the left when article 25—the channel there being a narrow one and not subject to the East River Rule—required them to go to the right of each other. The Bay State was thus thrown into a position which, according to her own story, required her to keep on the left hand side of a narrow channel. Her officers apparently did not know of the burden of the East River rule requiring vessels to keep in the middle of the river and and she proceeded to cross to the left side there in violation of the governing rule, also of the Narrow Channel rule, which she supposed was in force there. Nothing would have justified such a method of navigating with respect to the Wrestler, except a consent on her part. Such consent was testified to but was far from being established. The preponderance of testimony was decidedly with the Wrestler's contention and the probabilities favored it.

I fail to see any fault on the Wrestler's part contributing to the collision. The testimony shows that all the whistles she contended for were given by each vessel.

There will be a decree for the Transportation Company against the Bay State, with an order of reference. The libel of the Steel Barge Company will be dismissed.