## THE OREGON.

(District Court, E. D. New York. July 27, 1910.)

1. COLLISION (§ 37*)—VESSELS MEETING.

A boat, having accepted the two-whistle signal of a ferryboat approaching on the port side, and knowing that the ferryboat intended to pass down the river, and was compelled to turn to starboard on account of projecting pierheads, was bound to maintain her own course, so as to allow the ferryboat room to proceed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 34–36; Dec. Dig. § 37.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. COLLISION (§ 108*)—VESSELS MEETING—MANEUVERS IN EXTREMIS.

Where collision was imminent, a ferryboat was not negligent in making an incorrect maneuver, where it did what seemed to be best.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 225–231; Dec. Dig. § 108.*]

3. COLLISION (§ 123*)—NEGLIGENCE—BURDEN OF PROOF.

On libel against a ferryboat for a collision, the burden was on libelant to show negligence on the ferryboat's part.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 123.*]

4. COLLISION (§ 125*)—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

Evidence in libel against a ferryboat for a collision *held* insufficient to show that the captain of the ferryboat was negligent.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 266–279; Dec. Dig. § 125.*]

In Admiralty. Libel by United States against the ferryboat Oregon. Libel dismissed.

William J. Youngs, U. S. Atty.

Herbert Green, for claimant.

CHATFIELD, District Judge. The United States boat Traffic, while proceeding up the East River to the Brooklyn Navy Yard, passed about midway under the Brooklyn Bridge, and shaped her course somewhat toward the eastern side of the river, so as to round in to the Navy Yard at a reasonable distance from the pierhead upon the down-river side of the yard. Some distance up the river from the point where the Traffic would turn in to the Navy Yard was the ferryboat Oregon, proceeding down the river at a distance of 300 or 400 feet from shore, and following the general line of the pierheads, while an Erie Railroad tug was between the Oregon and the shore. According to the captain of the Traffic, another boat coming down the river, not far astern and to the starboard of the Oregon, passed to port of the Traffic as she reached the neighborhood of the collision, which was just below the Navy Yard and some 400 feet from shore.

The Traffic was going at about 9 knots speed, which with the flood tide would give her a total speed over the ground of probably 11 knots, and the Oregon proceeded at about an equal rate against the tide. But the speed of the vessels does not seem to have entered into the situation. The Oregon blew two whistles when the Traffic was some half a mile away, which were answered by the Traffic when

repeated by the Oregon, and the Traffic, in so far as she changed her course, ported her helm and turned to starboard.

It is evident from the testimony that the intention of the captain of the Traffic was to pass close to the starboard of the Oregon, unless the Oregon should first turn across toward midstream, when it would become proper for the Traffic to change to a one-whistle signal and pass to port. The distance between the boats was sufficient to make such a maneuver safe if properly carried out. The captain of the ferryboat, however, as he neared the southern side of the Navy Yard, was compelled to turn to starboard because of the projection of the pierheads, and his course, under the two-whistle signal, necessarily approached that of the Traffic. This was seen by the captain of the Traffic, who also noted the Erie Railroad tug coming down inshore of the Oregon, thus making it all the more necessary for the Traffic to keep to starboard and away from the Oregon.

Under these circumstances, and having accepted the signal of the Oregon, the Traffic, knowing the configuration of the shore, and that the Oregon was intending to pass down the river, was bound to maintain her own course in such a way as to allow the Oregon room to proceed. The testimony of the captain of the Traffic was that just before the collision the Oregon sheered sharply to starboard and came out into the river sufficiently to strike the Traffic upon her starboard bow, causing some injury to the Traffic, which, however, did not interfere with her progress into the Navy Yard, but did put her in danger of sinking.

The testimony of the captain of the ferryboat and its officers shows that the Traffic, coming up the river with the flood tide and continually bearing in, gave them reason to think that she was not going to follow the two-whistle signal which had been exchanged. The captain of the Oregon, under these circumstances, seeing that the distance between the boats was so small that danger was likely to result, blew an alarm and reversed his engines. He could not proceed further to port because of the presence of the Erie tugboat. He properly reversed his engines. And, even if this were an incorrect maneuver, things were at that time in extremis, and the ferryboat cannot be blamed for doing what seemed to be best at such a moment. As a matter of fact, if the ferryboat had held her course, the boats might have cleared by a distance, as estimated by the captain of the Traffic, of 15 to 25 feet. The effect of the reversed engine and the flood tide threw the bow of the ferryboat enough over to starboard so that the collision resulted.

The libel has been brought by the United States against the ferryboat for injuries to the Traffic. No fault can be found against the ferryboat for being in that particular locality, or on the port side of the river, as the lines of traffic are recognized by all navigators, and even the captain of the Traffic testified that he expected the ferryboat to come down on that side of the river against the flood tide, and she would have been out of her usual place if she had been coming down on the starboard side of the channel. See The Lowell M. Palmer, 142 Fed. 937, 74 C. C. A. 107. The narrow channel rule, therefore, does not apply, as has been held in the case of The Islander, 152 Fed.

385, 81 C. C. A. 511, and The C. W. Morse, 161 Fed. 847, 88 C. C. A. 665, and the only fault which could be imputed to the Oregon was that she did not expect the Traffic to take the risk of passing so close as 15 feet, and that, when her captain perceived the proximity of the Traffic, he undertook to keep out of danger by reversing. The boats were not meeting head on at the first exchange of signals, but would have passed starboard to starboard, and the signal recognized the fact.

The burden is on the libelant, that is the United States, to show that there was negligence on the part of the Oregon. It is evident from the testimony that the pilot of the Traffic estimated his distances with great accuracy, and that the Traffic would have passed the Oregon by a very narrow margin, if each boat had continued its exact course; the Traffic being under a helm which would have carried it sufficiently to port to have passed the Oregon without collision. But to hold that the captain of the Traffic was not at fault to the extent of getting his boat in collision does not mean that the captain of the Oregon can be held at fault for misunderstanding the movements of the Traffic at the time. If the ferryboat were attempting to prove liability upon the part of the Traffic, the situation would be different. But it does not seem to the court that the government has sustained the burden of proof to the extent of showing that under all the circumstances the captain of the Oregon was negligent in attempting to sound an alarm and get out of the way; and there is no other ground presented from which any argument of negligence on the part of the Oregon has been shown.

The libel should be dismissed.