## THE ASHLEY.

(District Court, E. D. New York. December 6, 1913.)

1. COLLISION (§ 8*)—NAVIGATION RULES—EAST RIVER.

The East River is a narrow channel, but boats navigating therein are not bound by the so-called narrow channel rule, but are required to observe the New York statute by keeping as nearly as possible in the center of the river, at the same time observing the general rules as to passing port to port when meeting and that in crossing the burden is on the one having the other on her starboard hand.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 7; Dec. Dig. § 8.*]

2. COLLISION (§ 95*)—TUGS AND TOWS NAVIGATING EAST RIVER—FAULT.

The tug Volunteer, with a sand scow on each side, was passing down and diagonally across East River on an ebb tide to the entrance to Wallabout Channel, when on nearing the Brooklyn shore a car float alongside the tug Ashley came into collision with and injured one of the scows. The Ashley was coming up near the Manhattan shore, but turned across in time to intercept the Volunteer, so that at the time of the collision they were on crossing courses. The Volunteer gave a two-whistle signal indicating her intention to cross ahead, which was apparently misunderstood. *Held* that, as the Ashley had previously been on no certain course, the Volunteer was not the burdened vessel under the starboard hand rule, but was within her rights in keeping her course, and that the Ashley was in fault for so changing her course as to bring about the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by the Phœnix Sand & Gravel Company, as owner of the scow Cherry, against the steam tug Ashley. Decree for libelant.

Foley & Martin, of New York City (William J. Martin, of New York City, of counsel), for libelant.

James J. Macklin, of New York City, for claimant.

CHATFIELD, District Judge. On the evening of June 20, 1911, at about 9 o'clock, the tug Volunteer was proceeding down the East River with two loaded sand scows, the Cherry and Gelt, alongside. The tug was between the sand scows, which were drawn together slightly toward the bow and were about 100 feet in length, while the tug was some 78 feet long. A third scow had been left at Fourteenth street, Manhattan, and the Volunteer proceeded with the ebb tide down the East River until she passed the point marked "10 St. Buoy," at a distance of some 200 or 300 feet to the eastward or toward Brooklyn. She then took a course toward the Brooklyn shore in such

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a direction as to carry her under the Williamsburgh Bridge, about one-third of the way out from the Brooklyn pier. The sand scows were intended to be taken into the Wallabout Channel immediately below the ferry slips which are just to the south of the Williamsburgh Bridge on the Brooklyn side.

It was about 9 o'clock in the evening, and the night was pleasant and clear, although there was no moon. The ebb tide had been running for several hours, and the testimony shows that a boat would be carried by the tide at the rate of about $2\frac{1}{2}$ miles an hour. The change in direction of the East River at the Navy Yard and the large opening caused by the Navy Yard (at the upper or northern side of which lies the entrance to the Wallabout Channel where the sand scows were bound) form an eddy which sends a current upstream along the Broadway ferry slips to a point well up toward the Williamsburgh Bridge. The master of the Volunteer testifies that this flood eddy extends several blocks above the Williamsburgh Bridge, along shore; but that particular point is immaterial in this case, for the Volunteer was out in the stream far enough to avoid the eddy until it reached substantially the point of collision. The existence of this eddy, however, makes it necessary for a boat coming down the East River with the ebb tide to go into the Wallabout or Navy Yard channels in a direction generally against the eddy tide, and thus to avoid being whirled around to such an extent as to make it impossible to reach the entrance to the Wallabout.

It is evident that a boat, proceeding from near the 10 St. buoy to the Broadway Ferry slips on the Brooklyn side would continuously show her green light to all boats further down the East River and coming up against the ebb tide.

The chart also shows that any boat coming up the East River, until it reached a point straight out from the Navy Yard, would show the red light to a boat coming down the river and not yet having passed the Williamsburgh Bridge.

A New York Central tug with a tow was coming down the river abreast of the Volunteer at about the 10 St. buoy, which she left to starboard some 50 feet. She overtook the Volunteer near what is known as the Third street reef, and passed the Volunteer some 200 feet to the west or to starboard.

As the Volunteer had come out from the New York shore and had then been further west than the New York Central tug, it is evident that in effect the Volunteer had crossed the New York Central's bows, and there is testimony on the part of the New York Central tug that a two-whistle signal was given by the Volunteer to the New York Central tow to indicate that the Volunteer was going to proceed toward Brooklyn. At any rate, the New York Central tow passed down to the west of the Volunteer, and, in order to obtain the benefit of the ebb tide, held near the center of the river until opposite Corlaers Hook, where she passed the Ashley, a powerful Jersey Central Railroad tug, having on her port side a car float loaded with 19 freight cars. The car float was some 280 feet in length and extended a considerable distance (about 130 feet) beyond the bow of the Ashley.

The Ashley had been coming up the New York side of the river to Corlaers Hook to take advantage of the protection of the shore against the ebb tide, and at this point made a turn toward Brooklyn. This turn is located by all of the witnesses in the case as having occurred nearly opposite, that is, straight out, from the upper pier on the Cob Dock in the Navy Yard, or nearly opposite the Corlaers Hook Park.

It is apparent from the testimony of all the witnesses that the turn was executed in such a way as to carry the Ashley and her float sharply across the river and to a point 400 or 500 feet from the continuation of the Brooklyn shore line down past the Navy Yard. The statements of the witnesses generally, as shown in the testimony, are based upon recollection some time after the accident. The testimony of the men from the New York Central tug is to the effect that the matter was fixed in their minds by conversations had the next morning, to the effect that a collision had occurred. They are positive as to what they saw, and are positive in stating that the Ashley passed to the stern of the New York Central tow, having come up on the New York side of that tow, and that no other railroad tug was in the vicinity. This accords with the testimony of the captain of the Volunteer, but is contradicted by the captain of the Ashley and his crew, who think that the only railroad tow in the neighborhood was that of a New Haven tug, which went down between them and the New York shore, and which forced them well out into the river towards Brooklyn, just opposite the Navy Yard.

The demeanor of the witnesses would indicate that each party was trying to be accurate in this respect, but the recollection of the New York Central's witnesses seems to be more trustworthy, and no trace of any New Haven tug in the river that night has been found. Testimony as to the situation, circumstances, and results of the collision is practically not in contradiction. The Volunteer, having blown a whistle to the Ashley, then blew an alarm, which it followed by another whistle and another alarm. The float of the Ashley coming in collision with the scow Cherry, caused some damage upon the forward starboard corner of the Cherry, while the overhang of the float plowed along the deck of the Cherry, burying itself in the sand and breaking down the bulkhead. The lines from the Cherry to the Volunteer were broken. Both the Ashley and the Volunteer reversed at or near the time of collision and moved apart, but the Cherry remained upon the bow of the car float, from which it was removed by the tug Gallagher, taken into the Wallabout, and placed near the dock, but in such condition as to list and leaking that it soon capsized and the load of sand was lost. The position of the collision seems to have been some 300 feet out from the lowest rack of the Broadway ferry. The exact distance from the shore makes no great difference, as the occurrence was, in any event, so far over toward the Brooklyn shore that the respective movements and rights of the boats control liability, and is affected by the distance from shore only in so far as it appears that the Ashley could not pass in shore nor proceed further straight ahead.

The Ashley testifies that the whistle signal from the Volunteer was

a one-whistle signal, indicating that it was to pass to port, and that the Ashley answered by a one-whistle signal, which was followed by an alarm from the Volunteer. The Volunteer testifies that it gave two signals of two whistles and also two alarms, indicating by the two-whistle signals that it was to pass across the Ashley's bow and pass starboard to starboard. The captain of the Ashley testifies that he saw the Volunteer when she was up the river under or above the Williamsburgh Bridge and as she emerged from behind the railroad tow, which he claims was that of a New Haven tug, but which appears to be the New York Central tow. The captain of the Ashley claims that he saw both lights of the Volunteer until just before the collision, when the lights changed to green only. This is manifestly impossible. The captain of the Volunteer testifies that he saw only the red light of the Ashley, until just before the collision, when he saw a reflection from the green light which immediately disappeared.

Whatever were the movements of the Volunteer, it is evident that she would see the red light of the Ashley practically up to the point of collision, and the question remains therefore, upon the facts, which was the burdened vessel, and whether, upon the courses and signals indicated, the Volunteer had the right to proceed toward Brooklyn in an attempt to enter the Wallabout across the Ashley's bows, or whether she was bound to hold her course down the East River and to pass the Ashley port to port, thus going under the Ashley's stern into the Wallabout, with the possible result of not being able to make the entrance to the channel.

It would seem from the testimony that the Volunteer must have given, as her witnesses testify, a two-whistle signal. The New York Central tug heard a two-whistle signal which they assumed was given to them, and they also testify that another two-whistle signal was given just before the alarm.

In view of the position of the boats and the intentions of the Volunteer, it is evident that a one-whistle signal could have been given to the Ashley only by mistake, for, at the time of giving such signal, the New York Central tug had not passed down the river sufficiently to either force the Ashley across to the Brooklyn shore, nor to bring the Ashley to a position where her turn toward Brooklyn could have already occurred, to a sufficient extent to prevent the Volunteer from crossing to the Brooklyn side. By the time that the New York Central tug was alongside the Ashley, the Volunteer was well over on the Brooklyn side, and a one-whistle signal to the Ashley seems impossible.

It must be held, therefore, that the Ashley either attempted to force the Volunteer to hold a course out in the river and allow the Ashley to proceed up the Brooklyn side, and thus to have changed the whistle signal—that is, crossed signals with the Volunteer—or else that the Ashley mistook the Volunteer's whistle and treated it as a one-whistle signal. The Ashley therefore was responsible for the collision, unless the Volunteer was bound to keep out of her way.

[1] The East River is a narrow channel, but it has been repeatedly held that boats navigating therein are not bound by the so-called narrow

channel rule and should respect the New York statute requiring navigation in the center of the river. The Bay State (D. C.) 153 Fed. 973; The Oregon (D. C.) 180 Fed. 299; The No. 4, 161 Fed. 847, 88 C. C. A. 665; The Somerville, 162 Fed. 681, 89 C. C. A. 473. But it has also been held many times, and it is evident that if two boats are meeting they are required to pass port to port under the general rule, or that if two boats are upon crossing courses the burden is upon the boat which has the other upon her starboard hand. The narrow channel rule is nothing more nor less in such a case than an application of the port to port rule in connection with the New York state statute. When, however, the presence of an eddy or a strong set of tide and the formation of the river makes it necessary to treat the channel as located upon one shore or the other all the way, by general custom, boats follow the line of the shore and do not take the middle of the river. In such case they are still bound by the general rules of navigation, and although neither of them may be considered a wrongdoer, and may be entitled to the protection of the obligatory rules of conduct from boats in the neighborhood, nevertheless any boat invoking a general rule of navigation as an excuse for its own acts or its allegations of fault must show that the rule is applicable.

[2] The claimant herein contends strongly that, because the Ashley was coming up the river in such a way as to show her red light while the Volunteer was coming down and crossing the river in such a position as to show her green light, the Volunteer had the Ashley upon her starboard hand when both boats were upon crossing courses, and that therefore the starboard hand rule required the Volunteer to keep out of the way of the Ashley, so long as the Ashley held her course and distance.

If the case were tested from these positions of the boats alone, there might be reason for the contention. But it appears that the Ashley was holding different courses at different times and yet throughout all of the times showing her red light. She came up the river from the Brooklyn Bridge by the New York shore. She crossed over to Brooklyn around or under the stern of another tow. She then proceeded toward Brooklyn in a general direction such as to head off the Volunteer. During all of this time her course was up the river to a point some two miles beyond. It cannot be said that she was holding any particular course with reference to the movements of the Volunteer. But, again, the Volunteer, under the starboard hand rule, would have been upon a crossing course only if those courses would intersect. According to the testimony of all the witnesses, the Volunteer would have passed ahead of the Ashley and gone down the Brooklyn side or into the Wallabout channel, several hundred feet from the Ashley's course at the time the first signal was given by the Volunteer. If therefore this was a signal indicating that the Volunteer would pass to starboard of the Ashley, and if the Ashley was then on a course generally up the river and had not reached a point where she would seem to be crossing the Volunteer's bow, then the Ashley was at fault for assuming that, by adoption of a course to head off the

Volunteer, she could make herself the starboard hand vessel and cross signals.

As has been said, the evidence that the Volunteer gave a one-whistle signal is not persuasive, and the case would seem to indicate that the Ashley, thinking to take the Brooklyn side of the river and not observing the New York statute by remaining in the center of the channel, but assuming that under custom and local conditions she could take advantage of the slacker tide and go up along the Brooklyn shore, mistakenly assumed that she had the right to force the Volunteer to pass her to port, and insisted on so doing until it was too late to avoid the collision.

The testimony shows that the Volunteer was backing before the collision and that her headway was considerably stopped. The Ashley must have been going at considerable speed, and, although there is some dispute as to the angle and the exact point at which the boat struck the scow, nevertheless the general testimony is that the bow of the car float, which projected over 100 feet beyond the Ashley, went into the forward starboard bow of the sand scow, and that the Ashley still had momentum enough to force the float partly through the scow and under her load. This would indicate that the Ashley was under greater way than the scow and bears against the contention of the Ashley that the Volunteer sheered across the course of the Ashley and floated down upon her thus causing a collision.

The libelant may have a decree.