## THE QUEENS.

## THE MANHATTAN.

## CITY OF NEW YORK v. UNITED STATES.

District Court, S. D. New York.
Oct. 16, 1931.

Arthur J. W. Hilly, Corporation Counsel, of New York City (William J. Leonard, of New York City, of counsel), for libelant.

George Z. Medalie, U. S. Atty., of New York City (Arthur H. Longfellow, of New York City, of counsel), for the United States.

WOOLSEY, District Judge.

My decision in this case is in favor of the libelant on the merits.

I. The jurisdiction in this case, which is a suit against a public vessel of the United States for tort, is based on the Act of March 3, 1925, Title 46, U. S. Code, § 781 et seq. (46 USCA § 781 et seq.) which may conveniently be called the Public Vessels Liability Act.

II. The collision occurred on July 2, 1927, at 11.09 a. m., off the southerly end of Manhattan Island, not far from a dredge, the Arundel, which was anchored at a point in a general southeasterly direction from the municipal ferry slips of the Staten Island Ferry and about seven hundred and twenty-five feet therefrom.

The distance across the channel there, from the southern end of Manhattan Island to Governor's Island opposite, is approximately 2,100 feet.

With that said as to what might be called the fixed geography of the situation, I turn to the active participants in the collision.

The municipal ferryboat Queens is a large steam ferryboat 250 feet long, 66 feet wide, with a single screw at each end, both of which are availed of in her navigation. Her pilot house is about 45 feet above the water line.

The revenue cutter Manhattan is 122 feet long, has 24 foot beam, and a draft of 11 feet 9 inches. She is what is known as an ice breaker, and has a bow of great strength, which is so sloped that she will work herself on top of ice, in order by her weight to break it. Her pilot house is about 15 feet above the water line.

There was another municipal ferryboat in the offing, waiting until the Queens came out, to go into the slip which the Queens was leaving. She does not figure in the question of navigation, but her master confirms the stories of the witnesses of the colliding vessels.

There are many points in which the parties are not very far apart, and I think the witnesses on both sides might fairly be described as unusually candid. It has in fact made my task of deciding the case a bit more difficult, because I could not feel that the witnesses on either side were attempting to tell a story which was not consonant with the facts as they saw them. Furthermore, the whole affair occupied only about two minutes in all.

III. Briefly summarized, the facts may be put thus:

At 11.07 a. m. on the 2d day of July, 1927, the ferryboat Queens cast off from her Manhattan terminal according to her regular schedule, blew a slip whistle, and started out with a right rudder, or hard aport helm, as it is often called, into the channel between Governor's Island and the Battery.

The tide was then running strong flood, which would mean that in this channel it was flowing to the eastward, with a strength estimated as being 3.8 miles per hour.

As she emerged from her slip, the Queens had, on her port bow, the dredge Arundel anchored by four anchors on her four several corners and lying, as I have stated, about 725 feet away. It was necessary for the Queens to follow one of three methods in coming out under the circumstances of tide existing at the time. According to the witnesses, she could have come out a short distance, and have allowed the tide to take her eastward, so that she could go around the eastern end of the dredge, making such maneuvers as might be necessary to hold herself in proper position whilst doing so; or, she could have gone much further out into the stream than she did, with a straight rudder, and then have turned to take her course towards Staten Island; or she could follow a third method, that which she actually employed, come out with a hard right rudder, seeking thereby to hold herself as much as possible against the tide whilst she was accumulating momentum, and then turn near the westerly end of the dredge and take her course for Staten Island.

In following the last method, I think that under the existing circumstances the Queens chose the wisest form of emergence from her slip.

Although the Queens started under a full speed bell, she had to overcome her inertia at first, and consequently her movement through the water was slow; but she accumulated speed so that at the time when the collision

occurred, which was at 11.09 a. m., after she had been running full speed two minutes, her speed was, as I estimate it, somewhere in the neighborhood of seven miles per hour.

I find that at that time she had come out as far as the place where the dredge was lying in the channel, had swung her stern around so that it would escape the dredge by an adequate, but not very ample, margin, and was headed so that she was in a position practically facing in the same direction as, and almost in line with, the dredge, except that probably she was a bit further to the southward than the southwesterly corner thereof. Perhaps it would be correct to say that the Queens at the time of the collision was about off the southwest corner of the dredge.

Returning to the story of her emergence from her slip, I find that when she had got to a point so that she was clear thereof, she observed the government cutter Manhattan coming along somewhat further out in the river than the dredge, and bearing on the port bow of the Queens approximately two points.

The Queens then blew a single blast signal to the Manhattan, indicating an intention to make a port to port passing; that is, to pass ahead of the Manhattan. She was answered promptly by a single blast of the latter, agreeing to the maneuver.

The situation then was that those in charge of the Manhattan knew, or should have known, that the ferryboat was not going to take advantage of the tide and pass eastward of the dredge, but was going to pass to the westward of her.

The precise position of the Manhattan at the time when those in charge of her first observed the ferryboat is put by them further to the westward than the place where the captain of the ferryboat places the cutter when she was first observed by him.

Whatever may have then been the precise position of the Manhattan, however, I am perfectly satisfied that, at the time when they exchanged single whistles, she was somewhat southward of the dredge; and whether she was about opposite the dredge or further eastward than such a point is not material. At any event, taking her own story, I think at the time when the single whistle signals were exchanged the Manhattan had reached a point where her bow was overlapping the southwest corner of the dredge. When she first heard the slip whistle of the Queens, she had slowed, and consequently, with the strong tide against her, her tendency to decrease speed would be very considerable. She did not, however, stop at that point. She only stopped when she heard the single blast whistle from the Queens, to which she replied.

At that point the two vessels had established an agreement under which the Queens was to cross ahead of the Manhattan's bow, and the Manhattan was to keep out of her way.

I think the Manhattan at this point, having due regard to the tide which was running, knew or should have known the course which the Queens must obviously have been following, because as she came out of her slip her stern was swinging to the eastward under the influence of the tide and her right rudder, and the Manhattan should have reversed her engine. But she did not, and I hold therefore that this is the point at which the Manhattan was guilty of fault.

The Manhattan, after she had stopped her engine, put her rudder right and her bow began to swing toward the Manhattan shore. In a very short time, it is difficult to tell how soon, but not more than half a minute later, realizing, as he admitted, that the ferryboat was drawing things rather fine and was swinging well over to eastward, so near the dredge as to make it doubtful to the captain of the Manhattan whether she would clear its anchor chains, the captain of the Manhattan put his engine astern and rang the jingle bell as a signal to give her all power possible. This of itself was a contemporaneous act, indicative of the fact that the danger of collision was seen to be near at that time. Very shortly after that, at 11.09 a. m., the ferryboat Queens, having swung her bow very rapidly to the westward, swung her after port quarter into contact with the bow of the Manhattan.

IV. It is only at this point that there is any serious conflict between the witnesses. The witnesses on the ferryboat stated that at the time when they were clearing the barge with their stern, the cutter Manhattan was about 75 feet away and alongside the end of the dredge. The men who testified, I think, were trying to tell me the story correctly, but they were not in a position to see how the ferryboat was heading. I think she was heading very much more to the westward than they thought; that her stern was pointing almost to the southwest corner of the dredge; and that the impression which they got, that the Manhattan was coming almost at right angles into them, was probably arrived at by reason of the fact that the ferryboat herself was swinging her after port quarter towards the Manhattan's bow.

On the other hand, the witnesses on the Manhattan said that, by the time the ferryboat came upon them, they had actually succeeded in getting a sternway on the Manhattan.

While I doubt that, it is extremely difficult to reconcile evidence of this kind when one does not feel any reason for thinking that the witnesses on either side are not trying to tell the truth. Of course, witnesses on moving vessels may be deceived by the motion of their respective vessels.

And so it may have been that those on the Queens, with her after end being swung quickly toward the Manhattan, got the impression that the Manhattan was coming rapidly toward the Queens.

However that may be, the collision did occur, and the angle between the vessels at the point of collision, as I find, was approximately forty degrees between the starboard side of the Manhattan and the port side of the Queens, which was struck quite far aft, with the result that several windows in the ladies' cabin were broken, and the guard of the ferryboat crushed.

The fact that the guard was crushed does not necessarily mean that the Manhattan was under way. That damage may just as well have happened because the Queens swung into the Manhattan's heavy bow with considerable momentum.

V. Under the provisions of the pilot rules governing inland navigation adopted by the steamboat inspectors pursuant to law, it was the duty of the cutter Manhattan to have avoided crowding in as much as she did on the naturally expectable course of the ferryboat under conditions such as then existed as to the tide. The Manhattan was therefore to blame because, contrary to the agreement, she impinged on the course of the ferryboat. Cf. Pilot Rule VII.

VI. I do not think that the Queens can be considered as in fault so as to require a division of the damages in this case.

She was coming out in a way that was perfectly proper; she was the privileged vessel; she signaled her intention, and the Manhattan consented to it; and the swing that she made was such a swing as would be naturally expectable under the circumstances existing that morning.

A case that is curiously like this case is that of The Breakwater v. New York, L. E.

& W. R. Co., 155 U. S. 252, 15 S. Ct. 99, 39 L. Ed. 139. There a starboard hand situation between a steamer and a ferryboat, much like that existing here, was found to exist by the Supreme Court, and it was held that the steamship was to blame for the collision with the ferryboat, which came out into the North River on a right rudder or port helm, as the Queens did here, and, when the wind and the tide struck her, proceeded to sag down stream before she could steady herself and proceed on the course that she wished finally to follow. The Supreme Court held that there was not any reason why a ferryboat should not leave its slip, although it saw another vessel approaching, provided, of course, that she gave it proper signals, and that then the other vessel, if it was the burdened vessel, would have so to deal with its own navigation as to avoid contact with the privileged ferryboat following her somewhat sidelong course.

Here we have the Queens coming out under a right rudder, following her regular course, and it cannot be said, merely because of the circumstance that the tide swung her towards the eastward, that she departed from her course. It is true that, when recalled to the stand, her master admitted that he had straightened her helm shortly before the collision; but so doing could not in any way, I find, have contributed to the collision or to a change in her course, because the tendency of a midship rudder would have been to decrease the tendency of her stern to swing further to the eastward, so that it was a maneuver which probably somewhat mitigated the swing of the Queens and merely tended to steady her on her intended course.

VII. I will enter an order providing that this opinion shall stand as the findings of fact and conclusions of law in this case.

I shall not allow any costs except such costs as may be involved in a reference, if any be necessary, to assess the damages.

The order making the opinion stand as the findings of fact and conclusions of law herein should be submitted before, or at the same time as, the interlocutory decree, and then an interlocutory decree providing for the recovery of its damages by the libelant and for a reference to a commissioner to hear evidence thereon and report to this court with all convenient speed will be signed.

Settle order and decree on two days' notice.