### THE CHEROKEE.

### THE HAMBURG.

### OCEAN S. S. CO. OF SAVANNAH v. CHEROKEE–SEMINOLE S. S. CORPORATION et al.

### THE GENERAL G. M. SORREL.

### CHEROKEE–SEMINOLE S. S. CORPORATION v. HAMBURG AMERIKANISCHE PACKETFAHRT AKTIENGESELLSCHAFT et al.

#### Nos. 167, 168.

Circuit Court of Appeals, Second Circuit.

April 9, 1934.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and W. Parker Sedgwick, both of New York City, of counsel), for appellant Ocean Steamship Co. of Savannah.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for appellee Cherokee-Seminole Steamship Corporation.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for appellee Hamburg Amerikanische Packetfahrt Aktiengesellschaft.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above).

This suit arose out of a collision in the North River, opposite New York Pier 30 or 31, between libelant's barge Utah, in tow on the port side of the tug Sorrel, and the steamship Cherokee. The Cherokee was bound for Charleston, and had come out of her slip on the north side of Pier 37 and was maneuvering to get on her course down the river. The Sorrel and her tow were going down the river from Pier 46, in the ebb tide, and were bound for Pier 14. The District Judge held that the rule of special circumstances applied and that the Sorrel was at fault for proceeding at too high speed when her master knew that the Cherokee was coming out of her slip, for as-

suming without warrant that the Cherokee would pass under her stern, and for not hauling more to starboard where there was plenty of open water in which to navigate. He also held that the Cherokee was at fault either for not making a shorter turn after she emerged from her slip and going down closer to the New York shore, or for not slackening her speed and passing under the stern of the Sorrel and her tow. The damages were accordingly divided.

Counsel for the Sorrel contend that the latter and the Cherokee were in a starboard hand situation and that the Cherokee was wholly at fault for not giving way, while counsel for the Cherokee argue that the case was one of special circumstances and that the Cherokee was a privileged vessel wholly without fault. We think each vessel was to blame, and that the decree should therefore be affirmed.

It cannot be doubted that the starboard hand rule did not apply here. The Cherokee had come out of her slip and was still attempting to get on her course when the collision occurred. She had blown her slip whistle. The Sorrel was near the middle of the river at the time. In such circumstances it has been frequently held that the case is one of special circumstances, and the emerging vessel and a tow going up or down the river must proceed with "due regard * * * to all dangers of navigation and collision." Article 27, Inland Rules; The Servia, 149 U. S. 144, 13 S. Ct. 877, 37 L. Ed. 681; The Olympic (C. C. A.) 27 F.(2d) 788. It is a case of special circumstances, whether an emerging vessel has backed from her slip and is getting on her course, as was the situation dealt with in the foregoing decisions, or whether she has left her dock, bow first, as in the case at bar. The El Valle (C. C. A.) 25 F.(2d) 619; The William A. Jamison (C. C. A.) 241 F. 950; The John Rugge (C. C. A.) 234 F. 861.

The master of the Sorrel testified that, when he was about off Pier 43 or Pier 42, he saw the masts and heard the slip whistle of a Clyde steamer in the vicinity of Pier 36, which was about 1,500 feet below him in the river. In spite of this warning he did not navigate with caution, but proceeded down the river at full speed. Indeed, he said that "when she was coming out didn't mean anything to me" because "I was so far out in the river, I wasn't in his way at all." When the Sorrel had got down to a point opposite Pier 38, the master of the Cherokee saw her, as the Cherokee was coming out of her slip, and blew two whistles and, as she emerged, blew two whistles again,

signifying that the Cherokee proposed to cross her bow. The master of the Sorrel testified that he did not answer these signals because he believed that they were directed to the Hamburg, a vessel off about Pier 15 and coming up the river. The master of the Cherokee, however, said that the Sorrel did answer his second whistles. However this may be, as soon as the tug President had brought the Cherokee out of her slip and pointed her down the river, she cast off, and about this time the Cherokee first saw the Hamburg coming up the river, slightly to the New York side of midstream. She blew the Hamburg one whistle signifying an intention to pass to the latter's port. This was replied to by the Hamburg, who proceeded on under a starboard helm until there seemed to be danger of collision with the Cherokee, when she stopped her engines, blew alarms, and reversed, at about 500 feet from the latter. The Cherokee was curving down so as to pass the Hamburg on her port side and get into the center of the stream and proceed down the river. She was a vessel 402 feet long, and could not get on her course without a considerable swing. Meantime the Sorrel, who was apparently on the New York side of the river but near the center, after porting slightly because of the one-blast signal from the Hamburg, kept her course and went on without slackening her speed until within less than 100 feet of the Cherokee. She then put her helm hard astarboard, but too late to avoid a collision between the Cherokee and the port side of the barge Utah about amidships. Just before the collision the Cherokee blew an alarm, went hard astarboard and full speed astern, but likewise too late for any effect.

Counsel for the Sorrel contend that she was over near the middle of the river and off Pier 36 when the Cherokee was emerging from that pier and that the latter, because of too great speed, finally ran her down. Of course, such a contention would hardly have been made if some of the testimony did not tend to support it, but we think it cannot be sustained. In the first place, it is quite out of accord with the views of the District Judge, who could not possibly have reached the conclusion that the Sorrel was at fault if the Cherokee was an overtaking vessel at the time of the collision. Moreover, the master of the Sorrel, when abreast of Pier 43 or 42, heard the Cherokee blow her slip whistle to leave Pier 36 and should have navigated with extreme caution. When the Cherokee first blew two whistles to the Sorrel, she had proceeded half her length or approximately 200 feet beyond the end of her pier, so, if we fix the Sorrel as off Pier 36 at this time, we are forced to assume that the Sorrel traversed a distance of about 1,500 feet, while the Cherokee, though represented by the appellant as impatient to proceed, was traversing less than half the space. Furthermore, if the Sorrel and her tow were abreast of the Cherokee's slip when she was coming out, it is inherently unlikely that the Cherokee would have run them down. Such a maneuver not only would have involved an extraordinary and gross violation of every rule of navigation, but would have required the Cherokee to move out of her slip and cross almost to the middle of the river within a time less than that taken by the Sorrel, which was confessedly going at full speed, to go a shorter distance before reaching the point of collision. A more fantastic antic could hardly be imagined. The engine movements of the Cherokee from the time she started from her berth until the collision indicate no such mad race. According to her log, they were as follows:

| | |
|---|---|
| 12:14 | Slow ahead |
| 12:15 | Stop |
| 12:16 | Half ahead |
| 12:17 | Stop |
| 12:17 | Half ahead |
| 12:18 | Full ahead |
| 12:18 | Full astern |
| 12:18 | In collision. |

Ridge, the first assistant engineer of the Cherokee, testified that his engine never actually went full speed ahead at any time because he got the counter order of "Full speed astern" before he could get his throttle open. It seems evident, unless the entries in the log were really fabricated, that the Cherokee would not have run down the Sorrel if the latter had been an overtaken vessel. Counsel for the Cherokee attempt to explain her speed by arguing that the Hamburg so crowded her that she was pocketed and had to hasten in order to avoid the Hamburg. But this contention will not bear scrutiny. In the first place, if the Cherokee was pocketed, it was her own fault, for there was plenty of room for her to pass between the Hamburg and the New York piers if she had been willing to proceed more slowly and to make a shorter turn. In order to get quickly on her course, she chose to arrive at the middle of the river as soon as possible by signaling for a port to port passage. The Hamburg acceded to her signal, and, after porting so as to swing farther in, as required, reversed and blew alarms as soon as she saw that a collision might occur. No one claims that the Hamburg got nearer to the Cherokee than 300 feet, and

she was probably considerably farther away. It was not her fault but that of the Cherokee and the Sorrel that the Cherokee suffered any embarrassment from the presence of the Hamburg, for both the Cherokee and the Sorrel insisted on proceeding incautiously as though the other was not in the river.

We think that the Cherokee had the right to come out when she did and to cross the bow of the Sorrel in order to get on her course to go down the river, and that the Sorrel should have held back in order to let her do this. The Sorrel was in fault for not slowing down when, before she got within 1,500 feet of the Cherokee she knew that there was a Clyde steamer about to leave her pier; she also was in fault for not going further to starboard when she saw the Cherokee coming out of her slip, signaling to the Hamburg for a port to port passage and taking a rather wide curve in order to do this. If she did not understand the Cherokee's signals and thought they were for the Hamburg, she should have sounded an alarm as required by Pilot Rule 1. This she failed to do.

But when the Cherokee saw the Sorrel, after porting about a point in order to avoid the Hamburg, continuing down the river on a straight course at full speed, she should have either slowed down and, if necessary, backed so as to allow the Sorrel and her tow to pass, or should have made a shorter turn and signaled the Hamburg for a starboard to starboard passage. While a large vessel like the Cherokee had the initial right to proceed as she did and took a swing no wider than the normal one, circumstances required her to contract it when she saw the course the Sorrel persisted in taking. If it was too late to contract it, she should have backed.

It is argued for the Sorrel that the river was not "clear" when the signal was given for the Cherokee to leave her slip, but, if "clear" be given the meaning of free from traffic, no vessel would be able to leave a pier on the lower North River, for there craft is always moving. The Sorrel was about 1,500 feet up stream when the Cherokee's flagman first observed her and not near the pier ends. The latter might properly indulge in the ordinary assumption that she would give way to a larger steamer leaving her pier. As the Supreme Court said in The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, 264, 15 S. Ct. 99, 102, 39 L. Ed. 139:

"The theory of the claimant that a vessel at rest has no right to start from her wharf in sight of an approaching vessel, and thereby impose upon the latter the obligation to avoid her, is manifestly untenable, and would impose a wholly unnecessary burden upon the navigation of a great port like that of New York."

It is said on behalf of the Sorrel that she thought the Cherokee had abandoned her first two-whistle signal when she later blew one, that both signals were intended for the Hamburg, and that it was too late for the Sorrel to go further to starboard when she finally ascertained the wide curve that the Cherokee was taking. On behalf of the Cherokee it is argued that, when she found that the Sorrel did not go to starboard, it was too late for her to arrange with the Hamburg for a starboard to starboard passage. If all these things be true, nevertheless each vessel was negligent in not navigating cautiously as soon as she learned that there was a chance of fairly close proximity. The Sorrel should have acceded to the Cherokee's signal (as the trial court found she did not), or should have promptly blown alarms if she deemed the proposal of the Cherokee dangerous or one which she did not understand. Persistence and haste in carrying through what had once been undertaken were the faults of both the Sorrel and the Cherokee.

We think the District Judge was justified in the analysis of the situation which he made and consequently in holding both the Sorrel and Cherokee at fault and in dividing the damages.

Decree affirmed.