## THE WEST POINT.

### THE MARION.

District Court, S. D. New York.
April 5, 1935.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, and Andrew J. McElhinney, both of New York City, of counsel), for libelant.

Lynch & Hagen, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for claimant.

WOOLSEY, District Judge.

I hold both the Marion and the West Point to blame for the collision which is the subject-matter of this cause.

Accordingly, an interlocutory decree dividing the damages and costs and providing for a reference to assess the damages will be entered.

I. At 7.01 p. m. on the evening of December 20, 1929, the ferryboat West Point, owned by the libelant, cast off from her bridge in the south slip of the ferryhouse at the foot of West Forty-Second street to proceed on her regular trip, which takes circa six to eight minutes, to the West Shore railroad terminal at Weehawken.

About three minutes later she was in collision with the starboard corner of the carfloat No. 4029, which was coming up river fastened to the port side of the Erie Railroad tug Marion.

The No. 4029 struck the port side of the West Point somewhat abaft of midships, and penetrated so deeply that the vessels remained firmly locked together until the ferryboat was shortly after pulled free.

II. I find that the collision occurred between 900 to 1,000 feet off the pier ends, and about 200 feet further down the river than the end of the rack on the southerly side of the ferry slip out of which the West Point had emerged.

The contention made on the part of the tug Marion that the special circumstance rule applied is obviously not supportable. The river at the point in question was only about 3,000 feet wide, and the collision, therefore, occurred about a third of the way from the New York side to the New Jersey side. The distance between the ferry bridge at Forty-Second street, Manhattan, and the ferry bridge at Weehawken, to which the West Point was bound, was about 4,100 feet, and, therefore, so far as the ferryboat's trip was concerned the collision occurred about a quarter of the way along the course she was following that day.

It is obvious that when a collision occurs so far out in a river as this did, it is not properly to be contended that it involves the maneuvres of a vessel leaving her slip. I hold, therefore, that this is clearly a case in which the starboard hand rule, Inland Rules, art. 19, 21 (33 USCA §§ 204, 206), applies. Consequently, the West Point was the privileged or holding-on

vessel and the Marion's flotilla was the burdened or giving-way vessel under that rule.

III. The weather on the evening in question was clear; the wind had not enough strength to contribute in any way to the collision. The tide was ebb, running down river at the rate of 2½ to 2¾ miles per hour.

The ferryboat West Point is 208 feet long and has a beam of 66 feet; her pilot houses are 40 feet from her ends and so about 125 feet apart. When she is running, two propellers, one at each end, are in operation. This double propulsion helps in her maneuvering ability so far as stopping, starting, slowing, and speeding up are concerned; she responds promptly to her rudder, and may, therefore, be properly described as an easily manageable vessel.

The tug Marion is a powerful tug of 900 horse power; she is 92 feet long, with a beam of 26 feet.

The carfloat No. 4029 is 340 feet long, with a beam of 40 feet, and on the occasion in question was loaded with gondola cars. She was fastened alongside to the port side of the tug Marion, and her forward end was about 150 feet ahead of the Marion's bow.

The Marion's flotilla was bound from Dock 4, Jersey City, where she had picked up the carfloat at 6:20 p. m. that afternoon, for Sixty-Eighth street. The flotilla was making a speed of about 4¼ knots through the water, which was reduced by the ebb tide, against which it was proceeding, to about two miles per hour over the ground, or about 200 to 250 feet per minute.

IV. When the West Point cast off from her bridge I find that she blew the usual slip whistle. She went full speed ahead for about twenty seconds to overcome her inertia, then went at slow bell to the end of the rack, and then with a ported helm she proceeded at full speed ahead gradually gaining headway until the time of the collision. Her speed at the time of the collision was between 7½ and 9 miles per hour.

As above noted, the West Point is 208 feet long and the length of the rack at the south slip whence she was emerging is about two of her lengths. When her bow was about 400 feet outside the end of the rack she blew a one-blast signal to the Marion indicating that she was going to cross the latter's bow. There was no answer to this whistle.

When the bow of the West Point was about 200 feet further out and she was about 600 feet from the flotilla she blew an alarm signal, to which the Marion did not reply, although she slowed her engines about this time.

If the Marion had then reversed at full speed I think that the collision would undoubtedly have been avoided; for owing to the flotilla's slow speed over the ground, to the fact that the tide was against it, and to the inevitable tendency of a reversal, when a flotilla is made up as this was, to throw its bow to starboard, the bow of the carfloat would then not have reached the side of the ferryboat.

When the West Point was about 200 feet further out she blew a second one-blast signal, and almost at once blew an alarm signal. The flotilla was then only between 40 and 50 feet off the West Point's port side. But the Marion did not change her course sufficiently to avoid the West Point as she was bound to do, although at about this time the engines of the Marion were reversed at full speed. This was too late, for almost at once the collision occurred.

V. As I understand it, it is common ground that there were not any whistle signals blown by the Marion; and the Marion contends that she did not hear any signals from the ferryboat until the last alarm signal at or immediately prior to the collision. A ferryboat with cabins lighted crossing the course of another vessel is easily observable and easy to avoid by a burdened vessel which maintains a proper lookout and is properly navigated. Moreover, a properly maintained lookout would have heard the West Point's whistle signals.

VI. When the West Point came to the end of the rack her bow began to feel the tendency of the ebb tide to turn her down river, and in spite of her hard aport helm, when she emerged from the slip she was swept bodily down the river for about 200 feet so that her actual course on the occasion in question was a course the first part of which curved down river from the ferry rack which she had left. The fact that at other times, or even habitually, she may have taken a course further up river has not anything to do with this case. Her course was a proper course for a ferryboat. It is the actual course followed that controls in a situation like this.

It is always expectable that the course of a vessel coming out of a slip into a tideway will tend to go in the direction of the tide until the forces resultant from her helm and speed control her sagging tendency. And it was the Marion's duty as the burdened vessel in this case not to impinge on that expectable course. Cf. The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 252, 15 S. Ct. 99, 39 L. Ed. 139; The Queens (D. C.) 54 F.(2d) 639, which are apt cases on the situation found in the instant case.

■ The Marion was clearly in fault, not only in respect of her lookout, but also because she did not reverse sooner and did not change her course towards the New York shore so as to pass under the West Point's stern.

■ VII. Ferryboats such as the West Point which ply like shuttles back and forth across the river without turning around at the terminals are, for convenience, equipped with two sets of red and green running lights, one set for use on eastbound trips, and one set for use on westbound trips. Each set of these lights is screened, as required by statute, so as to be visible only two points abaft the beam.

The usual procedure is to switch off the eastbound running lights and switch on the westbound running lights before the ferryboat leaves her bridge for a westbound trip such as that here in question.

The contention of the Marion's witnesses is that on this occasion through some mistake those in charge of the West Point, although they switched on the westbound running lights, failed to switch off the eastbound running lights, and that consequently she was showing both a red and a green running light on her port side.

Unusual as such a situation seems to be, for it involves lights unauthorized, so far as I am aware, either on sea or land, I find that it was the fact here that both the westbound and eastbound running lights were lighted on the West Point as she came out of her slip. It was so stated by the master of the Marion in his report made to the Steamboat Inspection Service a few days after the collision, and in this contention he was supported by the evidence of the members of his crew and by a Captain Decker, master of the Erie tug Shohola, which assisted the West Point in getting

over to Weehawken after the collision. It is perhaps also significant that, although Captain Decker named a Captain Henney as the master of one of the New York Central tugs which was also assisting the West Point, Henney was not called to deny the Marion's testimony on the question of the West Point's double running lights.

The erroneous use of these double running lights of the West Point had two effects:

(1) It not only constituted a breach of the Inland Rules, art. 2, subds. (b) and (c), 33 USCA § 172 (b, c), a breach of rule which the West Point has wholly failed to show did not contribute and could not have contributed to the collision, and which, therefore, puts her partly at fault for the collision.

■ (2) But also, it placed a mandatory duty on the Marion under article 18, rule 3 of the Inland Rules (33 USCA § 203, rule 3), to blow alarm signals, if she was not certain what the West Point was intending to do.

If, as he claims, the master of the Marion thought that the West Point was merely changing slips and was using both side lights to indicate her maneuver, as he said he had seen other ferryboats do, an alarm signal from him as the burdened vessel might have awakened those in charge of the West Point to the fact that the only other vessel as to which the West Point had to maneuver was for some reason uncertain as to what she was intending to do.

The Marion was in fault also, therefore, for not blowing an alarm signal when her captain observed the unusual phenomenon which I have just been discussing. I do not go into the question of the angles of visibility of this green light for I find that it was burning, and that when the captain of the Marion saw it, it did make him uncertain as to the West Point's maneuver.

For the reasons above stated, therefore, both vessels are in fault.

VIII. An order making the foregoing memorandum the findings of fact and conclusions of law in this cause may be presented for signature, or such an order may, if desired, be included in the interlocutory decree hereinabove prescribed.

Settle order and decree on the usual notice.