**THE WEST POINT.**

**THE MARION.**

No. 413.

Circuit Court of Appeals, Second Circuit.
July 13, 1936.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for libelant New York Cent. R. Co.

Lynch, Hagen & Atkins, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for claimant-appellee Erie R. Co.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On December 20, 1929, the Erie tug Marion, carrying a carfloat on her port side, was proceeding up the Hudson river on a course lying about 1,000 feet off the New York piers. An ebb tide was running at between 2½ and 2¾ knots per hour. The New York Central ferryboat West Point was crossing from her southerly ferry slip, at the foot of West Forty-Second street, New York City, to the West Shore Terminal at Weehawken, N. J. Each vessel continued on these courses until, at about 7:04 p. m., the starboard forward corner of the Marion's carfloat collided with the port side of the West Point a little aft of amidships. The collision resulted in damage to the West Point and injuries to the persons and property of her passengers. The total amounted to about $30,000, which with interest down to the date of the decree equaled $39,620.79. The carfloat apparently suffered no damage.

The trial judge decided that the starboard hand rule applied to the situation and that under it the Marion was the burdened or giving way vessel. He held her at fault for failing to keep a proper lookout, for failing to reverse her engines sooner than she did, and for neglecting to change her course toward the New York shore so as to pass under the stern of the West Point; but he held the West Point guilty of contributory negligence, because she left her ferry slip with her east bound running lights still burning and thereby misled the master of the Marion into supposing that the West Point was not going out into the river in order to cross to Weehawken, but was only angling about her dock for the purpose of changing slips. He accordingly only allowed the New York Central, as owner of the West Point, half damages. It has taken this appeal on the ground that full damages should have been allowed. The claimant, as owner of the Marion, has filed cross-assignments of error on the theory that the West Point alone was at fault and that her owner was not entitled to recover any damages. It seems clear to us that the Marion was solely to blame for the collision and that the New York Central should, therefore, be awarded full damages.

The West Point is a double end ferryboat 208 feet long. When she left her slip at the foot of West Forty-Second street on the night of the collision, she blew a long slip whistle and proceeded out into the river with her helm hard-a-port at full speed and held her course and speed up to the time when the carfloat of the Marion collided with her. Her speed was from 7½ to 9 miles per hour. Such are the findings of the District Judge. As she emerged from the slip, the ebb tide swung her down in the river about 200 feet below a course which would have laid straight out from the ferry rack she had left. When about 400 feet outside of the rack she blew a single whistle to the Marion which she had seen coming up the river against the tide. This indicated that she was proposing to cross the bow of the Marion and her tow. When about 200 feet farther out in the stream and about 600 feet from the carfloat, she blew an alarm. Upon receiving no signal of any kind from the Marion, and after proceeding about 200 feet farther out, the West Point sounded a second one-blast signal and almost immediately thereafter blew another alarm. She was then only 40 or 50 feet from the bow of the Marion's carfloat. The Marion at no time sounded any signals except an alarm, blown just as the collision occurred.

The facts found by the District Court as above seem to have been fully justified by the record. It ordinarily could not be doubted that the West Point upon leaving her slip was proceeding on her course and that it lay to the starboard of the Marion. The latter was, therefore, bound to keep out of the way of the West Point by holding back or

by changing her course so as to pass under the West Point's stern. The Marion did neither.

■ The Marion, however, contends that she was misled as to the course proposed by the West Point because she saw the eastbound running lights of the West Point lighted and believed that the latter was changing from the south to the north slip at her ferry rack, rather than proceeding to cross to Weehawken. In spite of much testimony introduced by the libelant which tended to disprove such an unusual and unlikely occurrence as the Marion claims to have happened, the District Judge believed the story of the latter's witnesses. But even if eastbound running lights of the West Point remained lighted, we are satisfied that they did not so mislead the master of the Marion as to have contributed to the collision. The testimony of the captains of the West Point and the Marion indicates that the West Point came straight out of her slip (Fols. 143; 650, 664, 665; 1156). If she did this her eastbound running lights (screened as they were) would not have been visible from the Marion or her carfloat. But even if they were visible, the doubt of the master of the Marion as to the course of the West Point could only have been momentary, for he testified that as soon as the West Point emerged from the ferry rack he knew that she was not changing slips (Fols. 698, 699). More than that, the District Judge on ample evidence found that the West Point blew two single blasts, one when 400 feet off the pier end, and another when 800 feet off, and that at 600 feet she blew her first alarm. Under such circumstances it was utterly reckless for the Marion to forge ahead giving no signals until within 40 or 50 feet from the place of collision. Yet such was the finding of the trial judge. Any fleeting doubt which the Marion might have had as to the proposed course of the West Point was resolved at a time when the latter was so far away from the Marion that there was abundant chance to avoid collision by backing or passing to starboard and going under the stern of the tug and float. In view of these things the presence or absence of eastbound running lights could not have had any relation to the accident. If the Marion did not hear the one-blast signals and the alarm sounded by the West Point, her lookout was grossly inadequate. In the case of the Marion, not only was there a failure to act in the face of warning signals, but, irrespective of any warning, there was a neglect to navigate properly. From the time that the West Point left her rack the Marion knew that the vessels were on crossing courses and that she, as the giving way vessel, had either to hold back or pass to starboard under the stern of the West Point. She did neither.

■ The contention of the Marion that the case was one of "special circumstances" has no support in the evidence. There is not the slightest doubt that a ferryboat emerging from her slip into an ebb tide will be to some extent carried downstream by the tide. But such a temporary diversion from the angle of her course is only a change of heading, not of course. A vessel thus proceeding is on her course and, as the vessel on the starboard hand, is privileged as respects the one coming upstream. The Breakwater v. New York, L. E. & W. R. Co., 155 U.S. 252, 15 S.Ct. 99, 39 L.Ed. 139; The Harry (C.C.A.) 57 F.(2d) 184; The Boston Socony (C. C.A.) 63 F.(2d) 246.

■■ There is no merit in the possible objection that the West Point continued to hold her course and speed at a time when such a mode of navigation was patently dangerous, instead of holding back or passing to starboard. In keeping her course and speed she was at all times obeying the starboard hand rule. If she had slowed down, as her course converged with that of the carfloat, there would have been a risk of colliding with the carfloat if the Marion had held back or gone to starboard in order to pass under the stern of the West Point. As soon as it became evident that a collision was imminent, the West Point endeavored to turn her bow to port in order to swing her stern away from the float. That act was dictated by the best judgment of the master at the time and in an emergency. If he made a miscalculation due to conditions arising from the failure of the Marion to heed his warnings and to keep out of his way, he cannot fairly be held responsible for the eventuality. His error, if any, was in extremis.

The libelant, New York Central Railroad Company, is allowed full, instead of half, damages and, as thus modified, the decree is affirmed, with costs to the appellant.